Morning ladies and gentlemen. Our first case for argument, Planned Parenthood of Wisconsin v. Schimel. Mr. Keenan. May it please the court, Assistant Attorney General Brian Keenan on behalf of the defendant's appellants, which include the Wisconsin Attorney General Brad Schimel, who's here in the audience today. The state would enact a new statute. The old statute, the Friday-Monday statute, that was clearly designed to close down the abortion clinics and nothing to do with women's health. So if that's the statute you're defending, you're defending more than you need to defend, really. Defending the wrong thing, right? That statute can't be justified in terms of women's health. On Tuesday, all the abortion clinics in Well, at this point... There was a clear, you know, flouting of Roe v. Wade. Well, I'm not sure that the statute was necessarily intended to close down all abortion clinics. Well, it had to, because they only had till Monday to get their admitting privilege. You don't get admitting privileges over a weekend. It takes months. Well, the bill encompassed more than just the admitting privileges requirements. Yes, I know, but with the admitting privilege requirement, all the abortion clinics would have to close down, right? Because none of them would get admitting privileges over the weekend. Many of them had admitting privileges already. Many of the doctors already had admitting privileges. Yeah, but what about the ones who didn't? They would have closed down, but there's no evidence that the Wisconsin legislature knew which ones did and did not have them. Yes, I know, but they surely knew that not all had them. Otherwise, they wouldn't need the law. Well, the law, you can enact a law even if everyone is currently in compliance with it to ensure that they... But that's not what happened, right? No, it's not. Let's stick to what happened. Sure, at this point, though, however, the flaw in the law in the sense of not providing a grace period to provide for, to apply for privileges has been resolved by the issuance of the preliminary injunction. We know you want us to forget that, but it's difficult, particularly when we're asked to consider the purpose of the statute. I guess I was wondering, Mr. Keenan, if you could describe a statute that you think would flunk the purpose test of Casey. Sure. Well, in one sense, it's hard to think of a statute that would flunk the purpose test that doesn't also flunk the effect test. But, for example, a law that just flatly prohibited abortion after a certain 12 weeks, 6 weeks, something like that. How about 20 weeks? 19 weeks? 20 weeks. I don't think so. It would depend on whether the viability, like the right in Roe and Casey depends on viability, so that's really the question there. Well, if this law were to take effect, then abortions after 19 weeks would effectively be prohibited in Wisconsin, correct? No. Those were the findings of the district court. There's nobody who's prepared to step in, correct? There's no one right now who currently provides that service. There's any number of people that could. You've told us that that shouldn't matter for a couple of reasons that I wanted to ask you about. First of all, you've suggested, if I understand correctly in your brief, that whatever might happen in Wisconsin, we would still need to take into account the ability of women in Wisconsin to travel to Chicago or Minneapolis or other places to be able to obtain abortion services, correct? Correct. Could you address our case in Eazell against City of Chicago in which we rejected precisely such an argument with respect to firing ranges and Second Amendment rights? Yes. Well, I think that the difference would be that with abortion rights, for example, in the preliminary injunction, Wisconsin had to provide abortion at the Appleton Clinic out of concern for the women who are in Michigan. So if Wisconsin has a duty to keep clinics open for the rights of women who don't live in Wisconsin and are coming... Sorry, what? An issue in this case with respect to the Appleton Clinic during the preliminary injunction was that that would affect the abortion rights of women in Michigan who live in the Upper Peninsula for whom that is the closest abortion clinic to them. So given that we have to have... We're under a burden to provide abortion services to women who don't live in Wisconsin, that it's only fair to consider the ability of women to move, to travel to different... That's a new one on me. But could you address though the reasoning in Eazell in which we described... Well, let me just quote. This reasoning by the district court in Eazell assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption, we said. In the First Amendment context, the Supreme Court long ago made it clear that one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. The same principle applies here, etc. Chicago couldn't deny the right to exercise religious freedom or freedom of speech or Second Amendment rights within the city of Chicago limits on the theory that people can just go elsewhere. So that would seem to me to at least undermine your argument with respect to Minneapolis and Chicago for abortion rights. If I could address that. If Wisconsin flat stands that abortion is available in Chicago. However, the constitutional right to abortion operates differently in the sense that it examines an undue burden, which is the effect the law has on various third party abortion... Yes. Well, what about the women who apparently... Half the women who get abortions or want abortions in Wisconsin are poor. What if they can't afford to go to Chicago for an abortion? You don't give them their car fare, do you? Excuse me, I didn't... You don't give them a car fare or a train ticket. No. What if they can't afford it then? Well, there's a factor that can be considered. What if they can't afford it? Well, what percentage can't afford it? That's the question. Yeah, what is the answer? What percentage can't afford it? Well, we think that the percentage is not high enough in terms of the number of women. No, that's not in this case. You haven't introduced evidence on that. Have you? Well, the number of women who receive an abortion every year is about 5,800 in Wisconsin the last year, the calendar year for which we have statistics. And the large fraction analysis looks to a denominator of the women of child-bearing age in the state of Wisconsin. I don't understand how this relates to their incomes. Well, some women are poor. Not all women are poor. Well, of course not all women are poor. You have no idea how many of these people you want to send to Chicago will actually afford to go to Chicago. Well, at AMS they ran a not randomized study and they thought that 50% of their customers, so to speak, were at the poverty level or received some sort of financial assistance to get the... That sounds like a high figure. So that would be 1,000 women in all of Wisconsin. And you don't care about those? Well, that's the total number. They serve us about 2,000 abortions a year. Well, it sounds like a significant fraction of the population would be able to go to Chicago. And our entire argument isn't that they have to go to Chicago. That's just for the one procedure for which the Planned Parenthood does not currently provide abortions past 18 weeks and six days. And so therefore, AMS is the only provider that is 19 weeks and beyond. Well, the Aurora Healthcare Center, that'll have to close, right? Under your view. The AMS? Yes. Well, they say that they would. Our position is that they haven't really tried to obtain privileges, so they might not have to if they made a more diligent effort. They could secure the privileges. Now, why is it you think admitting privileges are significant? What happens if a woman has a complication in the abortion? Is she sent to the emergency room, right? That's their current practice, yes. Well, where would you send her? No, that could be their current person. All right, go to the emergency room, where they are treated by, you know, emergency room doctors or other doctors in the hospital. So why is it important that the abortion doctor, who presumably just does abortions and doesn't deal with the complications, why is it important for them to have admitting privileges? You don't need admitting privileges. If you have an emergency, you don't need admitting privileges to go to a hospital. Just go to the nearest hospital. No, the admitting privileges are not needed to just go to the hospital. However, the admitting privileges would benefit the continuity of care for that woman when she goes to the hospital, and it also would provide sort of a stamp of approval for the physician knowing that they're qualified and that, in addition, the threat of losing the privileges... I don't understand that continuity of care. So if one has a family doctor or something like that, and you have some emergency, and you're sent to a hospital, it's unlikely actually that your family doctor is going to be treating you in that hospital, right? You're going to be treated by a specialist. But they would coordinate with the specialist in providing the care. Coordinate? What does that mean, coordinate? You have someone, has a medical emergency, is sent to the hospital, is treated by a specialist at the hospital. Now, what is the coordination role of the person who sent her there? Now, sure, the specialist may ask her family doctor about her condition and this and that and the other thing, right? But you don't need admitting privileges in order to talk to the people in the hospital. They don't need them, correct. But the state's experts thought that the proper standard of care would be for that physician to go to the hospital with their patient, particularly... Why? I don't understand that. I mean, it doesn't make any sense. You have an emergency at home. You go directly to the hospital. You don't go to your family physician to pick him up so that he can go in the ambulance with you. Well, the relevant comparison would be as if the family physician was performing some sort of procedure that caused a complication requiring transportation to the hospital. Then you would expect that the family physician would go to the hospital. Why? Well, they're the ones that were doing whatever it was that caused the complication. They know what happened. Right, and therefore they might want to have a discussion with the specialist about why they needed admitting privileges. Could I interrupt just a minute, please? I'll be a bit anecdotal here. I had an emergency. My family doctor, treating physician, called me immediately. It was after an in-bank argument here. I had cellulitis, and he calls the hospital. I said, well, what's wrong? He said, well, I need to go in there immediately because I had to be admitted immediately. Then he got me in there because he had admitting privileges. Back to the other subject that they've been talking about, and that is on access. The Planned Parenthood facilities did get admitting privileges. Now, the problem that they're discussing here is it's going to be too crowded at those. They got admitting privileges because they do other type of work that gynecologists do, and therefore they had admitting privileges, and that's how they got them. Smith and Christensen don't do anything else. Christensen retired once, and I know he closed the—I drive by it every time I come over here—the abortion clinic in Niles. It's mentioned in their record that's where they used to have one, and they did close that one. That was a late-term abortion, and he came over there and did it, but he's retired and then re-emerged. My point is that if poor people or whatever, they do have at least lesser access but still access under the present terms after our delay, because I agree that delay was unfortunate. I don't know what the situation is in state legislature, but in Indiana when I was in state senate, they did have a time when legislature ends. Maybe there was some emergency then that they had to get the bill passed, maybe not, but we dealt with that in the preliminary injunction discussion. So I'm trying to find out what, as far as the present situation is, and you mentioned Minnesota and Illinois, and we did that in the last discussion, which we talked about, and I did in my concurrence. Are they still open in Duluth and Minneapolis? Yes, those are still open. And then of course in Chicago. Yes, still open. And at this point, AMS is still open because of the preliminary injunction. The fear is that it would close if the law went into effect and the doctors did not have privileges. Mr. Keenan, on the abortions after 19 weeks, which the district court found would effectively be prohibited in Wisconsin, you've said in your brief that that's really not a significant number of women, right? It's 130 to 135 over the last several years. This is under 1% of abortions performed by AMS, and much less than compared to the total. I have trouble with that mode of analysis. First of all, we're talking about some of the most difficult and tragic situations often with late-term abortions, right? There's been testimony that sometimes it is and sometimes it's not. Often as a result of fetal anomalies, for example. That can be the case. Right. And have you looked at the discussion in Casey of the spousal notification requirement? Yes. And the way the numbers were talked about there, it was the 1% figure in your brief obviously that triggered my recollection of that, because the same kind of argument was made in Casey and was rejected, right? Well, the Casey court rejected an argument that the Casey court said that the fraction analysis had to be more narrow with respect to the spousal privilege, because, well, first off, it only affects the married women. The analysis does not end with the 1% of women upon whom the statute operates. It begins there, right? Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. And this law would effectively be a complete practical ban on late-term abortions in Wisconsin unless there were to be some fairly significant change if new clinics could open or policies could change, right? Well, in terms of that no one's providing it, yes. I think that does distinguish it in the sense that the spousal notification provision was a mandate from the state where every married woman would have to provide notification. The state is not banning anyone from performing abortions after 19 weeks. There are just four abortion providers in Wisconsin, three of whom have chosen not to do it, one of whom does, and any day could shut down on its own. Just four who were left, right? Yes. I mean... Okay. Let's see. Okay. Is there any evidence in the record, Mr. Keenan, and I'll ask opposing counsel the same question, about the number of annual admissions that a doctor needs to sustain admitting privileges? There is. So the evidence on that front is all the bylaws and the credentialing governing documents, so to speak, that are for the relevant hospitals were admitted into evidence. And so those documents would be the evidence in the record related to that. Each hospital is somewhat different in what they require, but there are... And there was briefing on this and we pointed out that there is probably over half of the hospitals did not have any... A physician could obtain admitting privileges requirement without a minimum number of admissions. Continuing. Yes. Even so, like the district court highlighted a provision that perhaps you'd come under review for not having admissions, but it wasn't a rejection of those privileges for not admitting sufficient number of patients. Well, one of the doctors said that Planned Parenthood was, I think, a bit concerned. Was it King? Is that the name? Dr. King, yes. Was a little bit concerned about doing enough other than abortion work, and I think she was concerned whether she was doing enough work and admitting into the hospital. So apparently wherever she had, at least, I think she had two or three places, she had many privileges, but that would be one concern, I suppose, that different places might lapse after a certain period of time. But the thing is, how many hospitals are there within 30 miles? I remember 24, but maybe that's too many. Yeah. In the Milwaukee area, I think there was 17 within the area of AMS. It's fewer in Appleton area. I'm forgetting this, but it depends on the clinic, obviously, how many hospitals are in the relevant area. But there are several different hospitals around each clinic. Well, the only thing, as I said the last time, is that the proximity to other abortion clinics in other states, obviously Chicago, as far as the southern part of Wisconsin, is probably as good of access as any, and up near Duluth and Minneapolis, they may be closer. So I am not concerned about having to go out of state. As I mentioned, there used to be a late-term abortion. I happen to live in Indiana, but it's over the state line, and that one is closed, and Christians in Rand, so I don't know what those folks are doing. But I think things do change, and I guess that's what they're exploring. I see my light is on. So how many women have died because they had a complication from an abortion and their abortions? In Wisconsin, none. None. That we know of. Now this Aurora Healthcare, don't they handle a very large number of abortions? I think it's Affiliated Medical, is their name. It's confusing because Aurora is an actual hospital system. Well, whatever it is. They handle, in the three years prior to trial, they had 2,100, 2,300, and 2,500 abortions. So that's closing down. Do the other abortion clinics have the resources to handle, or is this why you keep talking about sending them to Chicago? We think that most businesses would be able to handle additional customers when they come their way. Most businesses? Yes. Really? Yes. Most businesses don't turn away customers when they show up at their door, willing to give them money for services. If you can't hire staff, however, because of threats of violence and professional difficulties, then it's a different, it's kind of hard to expand capacity, right? And we've got findings on those facts. Well, those findings, Planned Parenthood has six doctors and its employee, AMS, I've been told by counsel, has hired a new doctor this summer. So it's not impossible for them to hire. They hired one doctor? Great. Let me ask you, you seem to agree to the preliminary injunction. When you say the preliminary injunction eliminated your Friday, Monday thing, you seem to accept that. Why do you accept that? Usually a preliminary injunction is just accepted until the case is over, right? Then the preliminary injunction is dissolved to some kind of permanent injunction. So are you accepting a permanent injunction against the enforcement of the Friday, Monday provision of your statute? No, I mean, I think that... Well, if you're not accepting it, then you're asking us to eliminate all of the abortion cases. None of them got privileges by the Monday after the statute was enacted. Well, that's not correct in the sense that some of them did have privileges. Okay, but what about the others? The preliminary injunction is a fact. It was in effect. No, no, the preliminary injunction is preliminary to the final injunction. And it prevents actions at the time. Yes, but the preliminary injunction dissolves when a final injunction is entered. You don't have multiple injunctions. That's what preliminary means. It's preliminary to a final judgment. Now the district judge has issued a final judgment. Now is it your view that this final judgment somehow altered the statute and dissolved the Friday, Monday part of the statute and therefore there's no deadline anymore about getting admission privileges? The preliminary injunction, I think, alters the legal status. No, you're completely wrong. A preliminary injunction is preliminary. It terminates when a final judgment is entered. Don't you understand that? Could the district attorney now prosecute attorneys who performed abortions without admitting privileges while the preliminary injunction was in place? I think that's questionable that they could do that, which would be the question at issue as I understand it. But at this point, if the permanent injunction is released, at this point going forward, yes, now they would need to have admitting privileges. And if they didn't, then they could be prosecuted. But they didn't have the admitting privileges by the Monday after Friday. So are you conceding that that deadline was invalid? Well, the deadline wasn't a deadline. The statute was silent as to the effective date. So therefore, the general effective date in Wisconsin statutes is that a statute goes into effect the day after it's published. That was what I was trying to lead to my other question. There is, if they don't put a deadline, it goes into effect automatically. Whatever you want to say, they overlooked it. Yes, and so... What occurred during the period of the, first the TRO and then preliminary injunction, it... For the legislature? No, with AMS and Planned Parenthood. They attempted to, well, Planned Parenthood obtained admitting privileges. It took some time. And based on the findings, they know it took some time and some effort. Dr. Smith and Dr. Christensen went to one or two. They thought that we'd be the easiest ones to get into because they had some sort of relationship and that was it. But that all occurred long ago, months ago. So what's, we are, at least me, I'm looking at what's the current situation. The current situation, not the way it was when they needed a preliminary injunction. Yeah, and the current situation is all the Planned Parenthood clinics have doctors that... All in violation, but most of them in violation of the statute. No. They missed the deadline. They missed the Monday deadline. As you said, the statute, by not mentioning effective date, it went into effect Friday. And on Monday, that was the deadline for the obtaining admission privileges if you didn't have them. And a lot of these clinics and doctors and so on violated that. My question is simply whether you concede that that was properly enjoined, right? Not whether there was a preliminary injunction, but you're now challenging the permanent injunction. We're no longer challenging the preliminary injunction, if that's the question. I just don't understand. The preliminary injunction is dead. It died when a permanent injunction was issued. The question is, do you question any part of the permanent injunction that erased that Monday deadline? No, I don't think we're questioning that. Okay, well thank you very much, Mr. Keenan. And I'll give you time after we hear from Ms. Flaxman. May it please the Court, Carrie Flaxman representing the plaintiffs. The district court, after a full bench trial, properly found that the admitting privileges requirement is unconstitutional. Defendants have tried to ignore the law of this case, this panel's previous decision in Van Hollen. And they also try but cannot identify any error, let alone clear error, in any of Judge Conley's well-supported fact findings. As the district court properly held, the law would undermine rather than further women's health, while at the same time having a devastating impact on women's ability to obtain an abortion throughout pregnancy in Wisconsin. There are simply no legitimate medical grounds for this requirement, and thus nothing that could outweigh the extreme consequences to women seeking abortions in Wisconsin. That includes the significant 8 to 10 week delay that will result from the Mr. Keenan stated. AMS provided 2,500 abortions in 2013. That's 40% of the abortions provided in the state that year. AMS's closure would leave Planned Parenthood overwhelmed and unable to absorb those 2,500 patients, causing the wait times of 3 to 4 weeks to balloon to 8 to 10 weeks, as Judge Conley properly found. In addition, the closure of AMS will result in virtual unavailability of abortions at or after 19 weeks of pregnancy in Wisconsin. And the number of women served by AMS at that gestational age is actually 250 women, according to the record. And for those women, too, there will be no services available in Wisconsin. Is there some reason why it has to be Wisconsin, if there's proximity in adjacent states? Your Honor, currently those abortions are available in the state. It's a legal service, and the state of Wisconsin cannot impose a restriction that would make those unavailable You're talking about those, meaning the ones on border? Which ones are those? Those what? AMS, this law, if it took effect, would close AMS. Because they didn't have admitting privileges. Because they don't have admitting privileges, and they're not able, they're facially ineligible, those doctors, to obtain admitting privileges at any of the 17 relevant hospitals in Milwaukee. When you say facially unable, I mean, at least two were unable. They checked with two hospitals. Your Honor, the two doctors at AMS, as the district court found after reviewing the bylaws and hearing the testimony, found them to be facially ineligible to apply for privileges at any of the 17 relevant hospitals. That's because hospitals all require that providers demonstrate competency to provide care in the hospital that they're seeking privileges to obtain. And the Planned Parenthood doctors do other, we'll call it, normal gynecological work in the hospital, apparently. So that's why, I think they said that's how they got their admitting privileges, because they do something other than abortions, the doctors. That's correct. The current doctors at Planned Parenthood do have separate practices, and as a result, they are able to demonstrate, and were able to demonstrate, competency in hospital-based procedures such as hysterectomy, such as deliveries. A lot of them are part-time, I guess. They are part-time. They are part-time in the clinic. And that's just another curiosity I have about other part-time people that might be able to work at AMS. But I think AMS is fully owned by Smith and Christensen, isn't that correct? They each own 50-50 of AMS? That's correct. And so that's, I don't know what the arrangement is at Planned Parenthood, but that's the one, they own it outright, and that's all they do. Well, the record showed, Your Honor, and Judge Conley found that it is very difficult, if not impossible, to hire other doctors to provide abortions. He found that given how difficult it is, given the climate of harassment and violence directed against abortion providers, as well as practice restrictions, doctors who provide general OB-GYN services, it's difficult for them to separately provide abortions because of practice restrictions, because of hospital restrictions. Because of that, the district court found that AMS would not be able to hire other physicians, and even if they could, those physicians would be unlikely to be able to obtain privileges, just like Dr. Smith and Christensen. And, of course, the irony in this law is that because doctors need to demonstrate competence in providing inpatient services, because that's what hospitals give out privileges for, they give out privileges for a full range of obstetrical and gynecological care, because they would need to do that, it means that the most experienced providers of abortion in Wisconsin, Judge Conley found, were Dr. Smith and Christensen. And this law would exclude those most experienced providers from being able to provide abortions, which would be another reason why there's no health interest actually furthered by this restriction. Well, Smith actually, doesn't he teach? Does he still do that, work with teaching new doctors or other doctors how to perform abortions? I believe Dr. Christensen has been on the faculty. He does that? My current understanding is he may be retired from that, but he has taught for years. I thought Smith was doing that, but it's not relevant. What is relevant, sort of an internal dispute here, is that I look at the, I guess you would call it the rational basis analysis of what a legislature, when it passes a law, with the scrutiny. And what we've done, I think, is created, I think, a higher burden. And I think there is that distinction. But under the rational basis analysis, would this, I guess, would there be something based on that determination that this would not survive scrutiny under a rational basis of what a legislator, the laws that the legislature pass? You obviously think otherwise. And I'd like to at least hear what you would say if the standard, I think we've upped the standard here in this previous opinion. But maybe if this were based on the rational basis analysis, would it survive scrutiny or would you still think it would not? No, Your Honor. We submit that it wouldn't. Judge Conley, first of all, found that this law did not satisfy rational basis in ruling on plaintiff's other claims. In addition, Judge Conley properly found that this restriction would pose a significant obstacle for women seeking abortions. And even under the test that the Fifth Circuit has applied, which I believe is what Your Honor may be referring to, that would be enough to satisfy the undue burden standard, even as applied by the Fifth Circuit. But to be clear, the standard, rational basis standard, is not only not what this court has previously applied both in the law of the case in Van Hollen as well as in Carlin, but it's also required by Casey and Gonzalez. The Supreme Court has always been clear that a law that restricts abortion must be demonstrated to actually advance the state interest at issue. The Ninth Circuit also has agreed with this panel's decision in Van Hollen. In the Humble case, Judge Fletcher wrote that decision and made clear that rational basis is not the test for evaluating abortion restrictions. These four other circuits have indicated otherwise. Your Honor, I believe at this point it's just the Fifth Circuit in evaluating these restrictions, and in any event, it is clearly inconsistent with the treatment that should be accorded to fundamental rights. And just to point out another problem with this application, with applying rational basis, the Fifth Circuit applied rational basis in evaluating a nearly identical admitting privileges requirement. There, the court accepted without challenge declarations put forth by two experts, Doctors Thorpe and Anderson, accepted declarations that had not been crossed because they were admitted over the plaintiff's objection. Here in this case, we had live testimony from both witnesses. Judge Conley, after hearing all the evidence, after hearing their testimony and evaluating it, did not credit those doctors' opinions, and is further reason why in the context of restricting a fundamental right like abortion, rational basis is not the test. It was rejected in Casey and has properly not been applied by this court. Well, he said several times, at least, that this standard that we set last year in this opinion, that there was a higher standard, a higher burden, a different, it's above the rational basis analysis. Correct, and the plaintiff said that that's the proper test. And then you have the prestigious law of the case, and that's what, I guess, he was dealing with. That's correct, and, Your Honor, Judge Conley properly applied that analysis in determining that this law does not further the state's asserted interest in health. Abortion was completely singled out for this requirement. Admitting privileges are not required for any other outpatient procedure performed in Wisconsin that includes procedures that are comparable to abortion in risk as well as procedures that are more dangerous. I didn't see anything in there because I was kind of curious about it, about where there is some kind of a problem where those kinds of doctors that do these other things do not have admitting privileges. It's not necessarily a state law, but is there any evidence that the doctors you refer to, colonoscopies and other somewhat invasive stuff that they do outpatient, do they have, does anybody know whether or not they have admitting privileges? Your Honor, they are not required to have admitting privileges. That's correct, and it would seem that in the legislature you don't deal with something unless there's a gap or something missing, and I guess the legislature determined in this procedure that they needed admitting privileges, and I don't know about any other of those comparables where they do outpatient work, whether or not they needed admitting privileges. Maybe they had them anyway and nobody worried about it. Well, Your Honor, to be clear, as this panel recognized in Van Hollen, there was no documented medical need for the law before the legislature. The only doctor who testified testified against this restriction. All of the leading Wisconsin medical associations came out against it. The AMA as well as ACOG and the Wisconsin Medical Society have submitted an amicus brief in support of plaintiffs here. What Judge Conley found is that this law was, as he said, a solution in search of a problem, that complications requiring treatment in a hospital after an abortion are extremely rare and may well happen when a woman is far from a hospital where a provider may have privileges. That happens in part because many complications after abortions happen after a woman has left the clinic and so she would go to the emergency room closer to her home. It also happens because the EMTs, if there is a direct transfer from a clinic, will frequently take the patients as they determine and not where a provider has privileges. As Judge Conley found, this, in fact, has happened to AMS, that half of their transfers, although the doctors intend for the patients to be transferred to Aurora-Sinai, are actually transferred to Columbia-St. Mary's, which is slightly closer to the clinic. That's a good point. Both the people who come from some distance, you know, it could be 100 miles away, and then some get home and find out she's got a problem. It's not near the hospital where it would be admitting privileges. And I can see where that creates a problem. But it has the same issue about distance you have to go to the clinic. People do travel long distances, and then when there's a problem, they go further away. I thought that was a rather important argument, actually. Right, Your Honor. And with respect to abortion clinics, with there being only four left in the state of Wisconsin, the distances that women are traveling are more significant than they might be traveling for other outpatient procedures. And they can be quite far away from whatever hospital that their provider has privileges in, if the provider has those privileges. You still have the other one that Christensen did. Is it Madison where he turned it over to Planned Parenthood? Is that the one in Madison? He did. It's Planned Parenthood now? Correct. I read that he turned whatever he gave it to them or something like that. He donated the practice to Planned Parenthood. Is Appleton the northernmost clinic? In Wisconsin, yes, Your Honor. How far is Appleton from the northern end of Wisconsin? That is a good question, Your Honor. Pardon? That's a good question, Your Honor. I don't know. I believe it's several hundred miles. There are presumably a lot of hospitals north of Appleton. There are hospitals north of Appleton. Could I ask you, Ms. Flaxman, the same question I asked Mr. Keenan, about if we dive into the hospital bylaws that are in evidence here and documents on admitting privileges, what will they tell us about the number of admissions needed to maintain privileges? That seems to be an issue with respect to the Planned Parenthood doctors. Yes, Your Honor. The Exhibit 66 is a summary exhibit of hospital bylaws in Milwaukee, and I believe it's 67 is a summary exhibit of the hospitals in Appleton. I'm sorry, 65 is Appleton. And what both of those, and those are summaries of the bylaws that are in the record. I believe it's Defendant's Exhibit 1104 has most of those bylaws. What those charts show is that the vast majority of hospitals have minimum admissions requirements to keep privileges. But what is not in that chart, to be clear, is in addition to minimum admissions, hospitals require doctors to demonstrate competency in inpatient procedures, even prior to giving out an application. Dr. Christensen wasn't able to get an application from Aurora because he could not demonstrate inpatient activity over the last two years. Okay. You said the vast majority require. I understand your point about eligibility for getting privileges in the first place, but there's also an issue in the record about doctors being able to maintain privileges. So what kinds of numbers are we talking about? I haven't seen those particular exhibits yet. And what about the hospitals that do not have such a requirement? Your Honor, all of the hospitals, to my knowledge, require demonstrating ongoing care in an inpatient setting. Ongoing care. Ongoing care, without regard to a number, that the doctors still need to demonstrate competency to provide inpatient care. Exhibit 98, I believe, are documents in which Dr. Flager, who's one of Planned Parenthood's doctors, was granted privileges. And it's clear from those documents that she needs to provide a certain number of procedures in the hospital. And this is the hospital that's away from her main area of practice, isn't it? Is geography an issue here? There are two. There's Appleton, the hospital in Appleton, where she obtained privileges, as well as Aurora Sinai, where she obtained privileges in Milwaukee. Aurora Sinai required her to do a certain number of proctored hysterectomies to maintain her privileges. And this is a... And how does that serve the purpose of ensuring women's health in providing abortion services? It doesn't at all, Your Honor. And, in fact, she's able to do that because she has a separate practice outside of OBGYN and gynecology. But she can do that in Milwaukee. But in Appleton, she only provides abortion services, right? Yes. So she wouldn't be able to meet a similar requirement in Appleton? That's correct. But none of the Planned Parenthood doctors who have obtained privileges in Appleton because of this law have used or will use that hospital. And so it will be difficult for them over time to maintain those privileges. Is there evidence that any hospitals associated with Catholic institutions are granting admitting privileges to doctors who do a significant amount of their practice in performing abortions? No, there's no evidence. Judge Conley very carefully goes through the evidence that was presented on both sides about religious hospitals, noting, first of all, a newspaper article and then some testimony about the newspaper article about whether or not Wheaton Franciscan would grant admitting privileges. Without checking with their lawyers first? And noting as well that all the Catholic hospitals require their doctors to meet compliance with the religious directives of the Catholic hospitals. Wheaton Franciscan specifically has a requirement that doctors not advertise abortion services, which the administrator of Wheaton Franciscan acknowledged had caused them to deny privileges to a doctor in the past. Ms. Fleischman, I see we're running out of time here, but I did want to ask you before you conclude, what do you think your equal protection theory adds to your case? I'm not sure that I see anything. Well, Your Honor, Judge Conley, we submit properly, found that the plaintiffs had shown that the law is unconstitutional on four separate grounds. Plainly, this court could find that we succeeded on any of those grounds, and that would be sufficient to sustain his judgment. One thing that surprised me a bit is the number of chemical abortions, which obviously are not hospital or clinic. It's a two-step process, and the second part of the process is at home. But it's a significant number. I was kind of surprised at that, like 20% or something like that. Do you know the figure, at least for AMS? I don't off the top of my head, Your Honor. It was in there somewhere, but I don't remember it. Yes, and that is correct, that the patient takes the second medicine at home, which is another reason why patients, in the rare instances where they might need hospital-based care or be concerned about a symptom, would not be close to a hospital where their provider might have privileges. If I could just ask one follow-up on one other thing. If we could go back to the Texas case. You referred to the Texas court was relying on affidavits from some of the same folks who testified in the Wisconsin case. Does the Texas case contemplate a further trial on the merits after the Fifth Circuit decision? No. The Texas case, and this is the first Texas case, Planned Parenthood v. Abbott. Yes. There was a trial. They consolidated the P.I. with a permanent injunction, and so the trial that was held, after the trial, the court relied on the declaration. And plaintiffs there were not allowed to cross-examine affiants? It was an abbreviated trial, as I understand. Yes. Given the timing, the plaintiffs brought witnesses to the hearing. The state did not, and the judge took in evidence from both sides, declarations from both sides. I've just never heard of, well, preliminary injunctions, obviously there's sometimes time pressure requires you to act in a hurry without perfect procedures. I've never heard of a final judgment being entered based on evidence that was not subject to cross-examination. But that's more an observation than a question, so thank you. Do we have any further questions? No. Thank you, Ms. Fosh. Thank you. Mr. Cannon. Just a few points. First, I'd like to start out just saying that I think I may have been misunderstanding Judge Posner's question, but we aren't challenging any sort of permanent injunction that would have given the doctors a reasonable amount of time to comply with the admitting privileges requirement, just to make that clear. With respect to the rational basis test, I think the plaintiffs are suggesting that the Gonzalez v. Carhartt furtherance of a legitimate government interest is somehow different from the traditional rational basis test, but that's just incorrect. I mean, for example, I found a case, Nordlinger v. Hahn, 505 U.S. 1, where at page 10 the Supreme Court says, the equal protection clause requires only that the classification rationally further a legitimate state interest. That's just traditional. But there is no rational basis for your statute because it doesn't have any health benefits for women who have complications for abortion. Well, the court-appointed expert said that he thought that admitting privileges did have a benefit, and he thought that it occurred in 90% of the time, and that he thought in an ideal world, yes, you would want both. He said it might have benefits, right? He didn't say it did have benefits. Well, I mean, I think that's-we're all dealing with, like, what will happen in the future. He said, yes, it might have benefits. And when that's the case, the legislature has the right to enact a law. Let me ask you another question. Governor Walker, before he withdrew from the presidential competition, said that he thought abortion should be forbidden even if the mother dies as a result of not having an abortion. Is that kind of official Wisconsin policy? Has the legislature expressed a view on prohibiting all abortions? No, that perhaps is Governor Walker's personal opinion, but it's not the state policy. In terms of the Catholic hospitals, which has been raised, there is evidence that abortion providers do secure privileges at Catholic hospitals. How many? Who? Where? Frederick Brookhisen, who was the former Planned Parenthood-he's no longer with Planned Parenthood, used to be. He was their medical director, was initially the plaintiff in this case. He had privileges for a number of years at Columbia St. Mary's Hospital in Milwaukee, which is a Catholic institution. Anything else? Anybody else? Also, Dr. Deborah Stolberg, who's the expert for the plaintiffs about, I would characterize it as the difficulty of abortion providers in finding doctors. She relied on some studies, and some of those studies showed that there were statistical surveys of abortion providers, and they asked them, who are you affiliated with? What type of practice do you have? And those studies, I don't recall the number, but it was something like 2%, 3%, 5% of those doctors surveyed who provided abortions were affiliated with Catholic hospitals. Does affiliated with, in that study, equal full admitting privileges? I don't think it was quite the same, but it does show that there is. The statute requires full admitting privileges, right? Correct. Not the so-called refer and follow. Yes, but the religious directives which the plaintiffs raise as the issue why a religious hospital might not provide privileges of any kind to an abortion provider would apply to any type of relationship, not just admitting privileges. So I think it's relevant to whether a Catholic hospital would grant admitting privileges to an abortion provider. In that regard, it's not, and I will admit it's not in this record, but it would seem that the stuff that I've read here and there is that in a Catholic hospital, if a woman were admitted who was suffering from a damaging abortion, it would have a different viewpoint of compassion for that person and would be willing to take her in and passionately understand what happened and, frankly, try to work with her from a spiritual point of view. But I realize that's beyond here because I only know that because I was curious about it. It would seem that would have been a reason where a Catholic hospital would allow admitting privileges just for that reason to help the person if she had that problem, whereas otherwise it wouldn't be or she might have been condemned or afraid to even deal with it. That's true. Dr. Hansen, the Wheaton-Franciscan administrator who was deposed, talked about how, of course, they would provide care to abortion patients who had some sort of complication. And if there was admitting privileges application for the purpose of providing that type of care, then I would think that would be considered by them in terms of whether to grant it or deny it as opposed to an ongoing relationship of providing actual abortions in the hospital. And just to be clear, Ms. Flax mentioned religious hospitals. This issue really only applies to Catholic hospitals. Dr. King has privileges at a Lutheran hospital, and Smith has a relationship with Aurora Sinai, which I think has a Jewish affiliation. So just to clarify that. And I think that's all I have. Okay, well, thank you, Mr. King, and thank you to Ms. Flaxman. This will be taken under advisement.